# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM B. LOGAN JR., Trustee, Bankruptcy Estate of Dorissha Tinnon, 50 W. Broad St. Ste. 1200 Columbus, OH 43215, | : : : : | CASE NO. 1:19-cv-1875 |
| Plaintiff, | : | |
| v. | : | **COMPLAINT** |
| B H 92 TRUCKING, INC., c/o Kemel Brown, Director of Safety 440 W. Boughton Rd. Ste. 210 Bolingbrook, IL 60440, | : : : : | |
| and | : | |
| AP EXPRESS SERVICES, INC. c/o Alen Poskovic, Owner 283 Mark Ave. Glendale Heights, IL 60139, | : : : : | |
| and | : | |
| ALEN POSKOVIC, c/o AP Express Services, Inc. 283 Mark Ave. Glendale Heights, IL 60139, | : : : : | |
| Defendants. | : : | **Jury Trial Demanded** |

-- 1 --

**I.    Preliminary Statement**

1. This action seeks compensatory and punitive damages; declaratory, injunctive, and equitable relief; prejudgment and post-judgment interest; costs; and attorneys' fees for the wrongful retaliatory discharge in violation of the Surface Transportation Assistance Act of 1982 ("STAA"), 49 U.S.C. § 31105, committed when Defendants terminated Ms. Tinnon because internally reported to Defendants that she could not drive in violation of the federal hours of service Regulations, would not falsify her driving records to feign compliance with such Regulations, and would not drive an unsafe vehicle in need of a repair that Defendants did not facilitate.

**II.    Jurisdiction and Venue**

2. This Court has jurisdiction over this action by virtue of 49 U.S.C. § 31105(c) and 28 U.S.C. § 1332 (diversity of citizenship).

3. Diversity jurisdiction is appropriate as the amount in controversy exceeds $75,000.00.

4. On October 6, 2017, Ms. Tinnon properly filed a complaint under STAA with the Regional Administrator for the Occupational Safety and Health Administration ("OSHA") Region 5, a division of the United States Department of Labor, within 180 days of her termination of September 13, 2017.  No final decision was issued within 210 days after the filing of the complaint and the delay was not due to bad faith by Ms. Tinnon, making this action proper under 49 U.S.C. § 31105(c).

5. Declaratory and injunctive relief is sought pursuant to 28 U.S.C. §§ 2201; 2202.

6. Compensatory damages and punitive damages may be awarded pursuant to 49 U.S.C. § 31105(b).

7. Costs and attorneys' fees may be awarded pursuant to 49 U.S.C. § 31105(b)(3)(A)(iii), federal common law, and Fed. R. Civ. P. 54.

8. Venue lies in this forum pursuant to 28 U.S.C. § 1391(b) because Defendant AP Express Services, Inc.'s headquarters are in Glendale Heights, Illinois, where Defendants made the decision to terminate Ms. Tinnon, giving rise to this action.

### III. Parties

9. Plaintiff, William B. Logan, Jr., is the Trustee of Dorissha Tinnon's ("Ms. Tinnon") bankruptcy estate. Ms. Tinnon, a resident of Franklin County, Ohio, was a joint employee of Defendant AP Express Services, Inc. and Defendant B H 92 Trucking, Inc. She served as a CDL truck driver in the transportation department, a position she held from August 3, 2017, until her termination on September 13, 2017; and earned $0.50 per mile, drove approximately 3,000 miles per week, earning approximately $1,500 weekly.

10. Defendant AP Express Services, Inc. ("Defendant AP Express"), an Illinois corporation, is headquartered and maintains its principal place of business in Glendale Heights, Illinois; is engaged in business affecting commerce that owns or leases a commercial motor vehicle in connection with that business or assigns an employee to operate the vehicle in commerce; and was a joint employer of Ms. Tinnon with Defendant B H 92 Trucking, Inc..

11. Defendant B H 92 Trucking, Inc.("Defendant B H 92"), an Illinois corporation, is headquartered and maintains its principal place of business in Bolingbrook, Illinois; is engaged in business affecting commerce that owns or leases a commercial motor vehicle in connection with that business or assigns an employee to operate the vehicle in commerce; and was a joint employer of Ms. Tinnon with Defendant AP Express.

12. Defendant Alen Poskovic ("Defendant Poskovic") was at all times material to this Complaint the alter ego of Defendant AP Express Services, Inc., in the position of Owner and on paper one of its employees, and was delegated by Defendant AP Express the authority to terminate Ms. Tinnon and to assign her to operate a vehicle in commerce.

## IV. Facts

13. Defendant B H 92 and Defendant AP Express maintain a contractual relationship in which Defendant AP Express leases trucks, drivers, and cargo transportation services to B H 92 in exchange for 89% of the revenue it receives from the shipper or consignee for the transportation of commodities.

14. Ms. Tinnon began working jointly for Defendants on August 3, 2017 as a CDL truck driver, after she applied based upon a job advertisement maintained by Defendant B H 92 through its website. Ms. Tinnon was required to provide Defendant B H 92 with her driver's license and get her daughter approved as a passenger through Defendant B H 92's insurance.

15. When Defendant B H 92 confirmed that Ms. Tinnon could drive for it with her daughter through B H 92's insurance, she traveled to its Bolingbrook office to complete her orientation and employment documents, including I4, 1099, B H 92 policies and procedures, and other additional documents.

16. On August 9, 2017, Defendant B H 92's Director of Safety, Kemel Brown ("Mr. Brown"), asked Ms. Tinnon for her direct deposit routing number and account number to ensure payment for her employment.

17. The next day, Ms. Tinnon texted Mr. Brown to confirm that all of her pre-employment steps, including paperwork and drug testing, were complete through Defendant B H 92, to which he replied, "Yes, all set".

18. Defendants B H 92 and AP Express jointly employed Ms. Tinnon under an arrangement where they would share her services.

19. When Ms. Tinnon began employment, Defendant B H 92 provided her with a truck to drive, owned by Defendant AP Express and leased to Defendant B H 92.

20. On August 10, 2017, Ms. Tinnon complained to Defendant B H 92, via a text to Mr. Brown, stating that the truck had not been cleaned or serviced.

21. Mr. Brown replied that he would talk to Defendant Poskovic, owner of Defendant AP Express, and that Defendant B H 92 "always get[s] trucks through the shop and clean[s] them."

22. On August 14, 2017, Ms. Tinnon reported to Mr. Brown that the truck had major issues, including "Tri pack Check alternator (alt)[,] tires [,] pm[,] service[,] turbo wire needs replaced" and that her "tri pack [was] completely out."

23. Mr. Brown promised he would speak with Defendant Poskovic about the truck issues, but the issues remained unfixed.

24. On September 5, 2017, an inspection of Defendant AP Express' truck found three violations on the truck's condition, which Ms. Tinnon discussed with Defendant B H 92 and forwarded a copy of the inspection to it.

25. After this incident, Defendant B H 92 instructed Ms. Tinnon to "please make sure to take picture [sic] of all four sides of the trailer and the bill of lading [sic] and text them to me before you leave the shipper."

26. Ms. Tinnon was issued a ticket while driving the truck at a weigh station. That ticket was issued to Defendant B H 92, who leased the truck from Defendant AP Express.

27. Ms. Tinnon asked Mr. Brown if she could drive a company truck owned by Defendant B H 92 in order to avoid the problems with the truck owned by Defendant AP Express, to which he indicated he would talk to Defendant B H 92's owner about that prospect.

28. On or about September 13, 2017, Ms. Tinnon's company commercial truck, owned by Defendant AP Express and leased to Defendant B H 92, broke down in Memphis, Tennessee while she was en route to pick up a load.

29. Ms. Tinnon called one of her supervisors, Defendant Poskovic, to inform him that the truck was broken down on the side of the road due to an ongoing issue with its regen system, which she had complained about at least five times prior to this occasion. That caused her truck to only be able to drive thirty miles per hour or less on the highway. The repairman stated that it could be fixed by towing it to Volvo or unplugging the speed sensor, which would override the issue, to drive it.

30. Unplugging the speed sensor rendered driving the truck unsafe.

31. Absent repairs to the conditions that broke down the truck on the side of the road, driving it was unsafe.

32. Prior to speaking with Defendant Poskovic, Ms. Tinnon spoke with one of Defendant AP Express' dispatchers, who informed her that Defendant Poskovic stated if she did not take the load to its destination, she could bring the truck back to Chicago, meaning she would be fired.

33. Defendant Poskovic confirmed that Ms. Tinnon would be fired if she did not take the load to its destination, even though Ms. Tinnon would be required to drive in violation of the federal hours of service Regulations in order to get to the pick-up location one-hundred and fifty

miles away from the spot where her truck broke down. The truck was not in safe operating condition.

34. Ms. Tinnon replied that she could not take the load because she did not have enough hours to do so before her driving shift was required to end by law.

35. At the time of that call to Defendant Poskovic, Ms. Tinnon was only able to drive for another one hour and fifteen minutes before she would be required to stop.

36. Defendant Poskovic, upon learning that Ms. Tinnon would be required to drive in violation of federal Regulations in order to complete the delivery, threatened her employment by stating, "If you don't have hours, you can park right now and tomorrow you can bring the empty truck back to Chicago. I can't do nothing [sic] else."

37. Ms. Tinnon confirmed Defendant Poskovic's threat, "So you're firing me because I cannot pick up the load?"

38. Defendant Poskovic replied, "If you cannot pick up the load, it's like under thirty miles from you, take two hours driving."

39. The pick-up location for the load was one-hundred and fifty miles away from Ms. Tinnon, not "under thirty miles."

40. Ms. Tinnon informed Defendant Poskovic that the load was one-hundred and fifty miles away, and asked if his direction to pick up the load anyways meant he was "going to fire [her] because [she] can't pick up the load illegally."

41. Defendant Poskovic stated, "yes, correct," that he was going to fire Ms. Tinnon for not picking up the load when it would be illegal for her to drive more hours.

42. Defendant Poskovic made it clear to Ms. Tinnon that he was more concerned about "throw[ing] off the day" and "cancel[ling] orders" due to her inability to pick up the load than he was about Ms. Tinnon complying with the relevant federal Regulations.

43. Ms. Tinnon told Defendant Poskovic that it was not her fault that she did not have enough hours to pick up the load and again mentioned he was asking her to "drive illegally."

44. Defendant Poskovic then argued with Ms. Tinnon, stating no, he was not asking her to drive illegally, but rather was "just ask[ing] if [she] could make it 30 miles, at least two hours, to be there and pick up."

45. Ms. Tinnon did not have two hours remaining to drive; if she drove over one hour and fifteen minutes, she would violate the federal Regulations.

46. Ms. Tinnon reiterated that she did not have the two hours driving time Defendant Poskovic was demanding to pick up the load and asked what she was supposed to do.

47. Defendant Poskovic said he did not know, yet suggested that Ms. Tinnon "make it 30 miles or 30 minutes longer or make it twenty minutes to pick up the load."

48. Ms. Tinnon asked Defendant Poskovic if he was telling her to falsify her logs by changing her time.

49. Defendant Poskovic said "yes" he wanted her to "change" her logs to "make it thirty or forty minutes."

50. At this point, Ms. Tinnon stated, "I don't really feel comfortable driving illegally, Alen. And you know, like I said, that's not my fault, so for you to tell me that if I don't pick up the load, then I'm basically fired, that's not fair to me."

51. Defendant Poskovic insisted that Ms. Tinnon "could make it thirty minutes to pick up the load" and that she "could move like thirty minutes."

52. While Defendant Poskovic continued to insist that picking up the load would be "just thirty minutes," Ms. Tinnon reminded him that, because she only had an hour and seven minutes left, accounting for the duration of her call with him, she would "have to add a whole other [sic] hour."

53. Ms. Tinnon knew the pick-up location was a hundred and fifty miles from her because she was "looking at the GPS" during her call with Defendant.

54. Based on the GPS and the fact that Ms. Tinnon would "have to go over a scale house," the trip to pick up the load was going to take "over an hour," a fact that she relayed to Defendant Poskovic.

55. Defendant Poskovic advised Ms. Tinnon to "skip the weigh station to go pick up the load" which would make the trip "two hours" if she "can adjust the hours."

56. Ms. Tinnon advised Defendant Poskovic, again, that if she passed the weigh station, she would "still have hours," but if she kept "driving [she would] go out of hours."

57. Defendant Poskovic asked Ms. Tinnon if she was using electronic logs or paper logs to keep her time.

58. Defendant Poskovic told Ms. Tinnon he wanted her to use "paper ones so [she] can move like thirty minutes around."

59. Ms. Tinnon said "if I do the paper logs then I'mma [sic] have to go back from when I did my thirty-four hour reset."

60. Defendant Poskovic suggested instead of resetting her logs, Ms. Tinnon could just claim that she was in Memphis all week for her hours.

61. Ms. Tinnon was uncomfortable driving illegally, and informed Defendant Poskovic that she would "just drive home tomorrow and get [her] stuff out and just bring the truck back there" to Chicago and that she would not be driving illegally.

62. Defendant Poskovic stated he would tell the broker that there would be no pick up that day and told Ms. Tinnon "that's it."

63. After the call, Ms. Tinnon drove back to Chicago to drop off the truck and Defendants fired her because of her refusal to drive in violation of the law.

64. The next day, Defendant Poskovic texted Ms. Tinnon, "Yesterday situation it was bad for the company. We screwed up 2 Broker on same day and the [sic] put us on not use list. I know I was mad. I tell you to come to Chicago but if you want stay you can continue driving."

65. Ms. Tinnon responded to the text that she would have continued driving if the truck was properly repaired by Volvo, but Defendants never repaired the truck and, as a result, Ms. Tinnon did not continue driving for Defendants.

66. Ms. Tinnon knew that if the Department of Transportation or other regulators discovered that she had fabricated her hours she would be subject to fines and a suspension of her commercial driver's license.

67. Had Ms. Tinnon's commercial driver's license been suspended as a result of fabricating her hours, she would not have legally been allowed to work in her chosen industry.

68. At all times material to this complaint, Ms. Tinnon operated as a property-carrying driver subject to the federal hours of service Regulations.

69. Ms. Tinnon filed a complaint with OSHA against Defendant B H 92 and Defendant Poskovic under 49 U.S.C. § 31105, which was not resolved within 210 days after the filing of the complaint.

70. Ms. Tinnon's OSHA complaint against Defendant B H 92 and Defendant Poskovic put Defendant AP Express on actual or constructive notice of the charge.

71. The federal Department of Transportation has clear public policies, enshrined in 49 C.F.R. 395, against property-carrying CDL drivers driving more than eleven hours following ten consecutive hours off duty; beyond the fourteenth consecutive hour after coming on duty, following ten consecutive hours off duty; or after being on duty more than sixty hours in any seven consecutive days.

72. Driving beyond those mandated hours requirements violates those clear public policies limiting the amount of time one commercial driver can drive on the road.

73. The federal Department of Transportation has a clear public policy, enshrined in 49 C.F.R. 395.8, requiring that commercial drivers keep an accurate and current driver's record of duty status (commonly referred to as a "drive log").

74. Misleading the federal Department of Transportation about the total amount of time an individual commercial driver spends on the road and the location of the driver for the week also violates those clear public policies.

75. The federal Department of Transportation has a clear public policy, enshrined in 49 C.F.R. 393.82, requiring that commercial drivers operate a motor vehicle with an accurate speedometer and avoid operating, under 49 C.F.R. 396.7, a vehicle in a condition likely to cause an accident or breakdown.

76. Operating a vehicle with a disconnected speedometer violates those clear public policies and presents a safety risk.

77. Retaliation against an employee for refusal to violate the Department of Transportation's clear public policies jeopardizes those policies.

78. A contributing factor in Defendants' decision to discharge Ms. Tinnon was that she refused to violate the federal hours of service Regulations and/or unsafely operate a vehicle.

79. Ms. Tinnon suffered and continues to suffer emotional distress proximately caused by her wrongful retaliatory discharge.

80. Ms. Tinnon suffered and continues to suffer tainting of her employment record proximately caused by her discharge.

81. As a result of Ms. Tinnon's termination, she was unable to find reasonable replacement work for over four months.,

82. Ms. Tinnon's driving record reflects her previous employer as Defendant B H 92 Trucking. Upon accepting new employment, she was asked to sign a release for Defendant B H 92.

83. When Ms. Tinnon was able to secure reasonable replacement work, the pay and benefits were significantly less than she was earning while jointly employed with Defendants.

84. As a result, Ms. Tinnon continues to be economically damaged.

85. Defendants' violations of the Department of Transportation's public policies and the resulting vengeful wrongful retaliatory discharge of Ms. Tinnon were malicious, in bad faith, or wanton or reckless.

## V. Legal Claims

### (Count I)
### Claim for Wrongful Discharge in Violation of the Surface Transportation Assistance Act of 1982

86. Plaintiff incorporates, as if fully realleged, paragraphs 1 through 85 of this Complaint.

87. By terminating Ms. Tinnon's employment after she refused to operate a commercial vehicle because such operation violated the federal Department of Transportation's hours of service Regulations, which are related to commercial motor vehicle safety, health, or security, and/or the vehicle was in an unsafe operating condition, Defendants violated the Surface Transportation Assistance Act.

WHEREFORE, Mr. Logan requests that this Court:

A. declare that Defendants, jointly or severally, committed the wrongful retaliatory discharge of Ms. Tinnon;

B. award back pay, compensatory damages for emotional distress, anguish, embarrassment, and frustration, and pre- and post- judgment interest in an amount exceeding $75,000;

C. award punitive damages;

D. award attorneys' fees and costs; and

E. grant such other relief as the Court may deem appropriate.

## JURY DEMAND

Plaintiff requests a jury on all claims, defenses, or factual issues triable by a jury.

**RESPECTFULLY SUBMITTED,**

By: s/Michael I. Leonard
**Counsel for Plaintiff**

**LEONARDMEYER LLP**

Michael I. Leonard
Madelaine M. Thomas
120 North LaSalle Street, Suite 2000
Chicago, Illinois 60602
(312) 380-6559
(312) 264-0671 (fax)
mleonard@leonardmeyerllp.com
mthomas@leonardmeyerllp.com

John S. Marshall (0015160)
(jmarshall@marshallforman.com)
Edward R. Forman (0076651)
(eforman@marshallforman.com)
Samuel M. Schlein (0092194)
(sschlein@marshallforman.com)
Helen M. Robinson (0097070)
(hrobinson@marshallforman.com)
**All moving for *pro hac vice* admission**
MARSHALL & FORMAN LLC
250 Civic Center Dr., Suite 480
Columbus, Ohio 43215-5296
(614) 463-9790
(614) 463-9780 (fax)

**OF COUNSEL:**
Louis A. Jacobs (002101)
**Moving for *pro hac vice* admission**
(LAJOhio@aol.com)
177 19th St., Apt. 9C
Oakland, CA 94612
(614) 203-1255
(510) 250-9007 (fax)